POHL v GILBERT

Docket No. 78-873. Submitted December 13, 1978, at Lansing.—Decided March 20, 1979. Leave to appeal denied, 406 Mich 981.

Mary Ann Pohl brought an action under the no-fault automobile insurance act against Phyllis G. Gilbert in Ionia Circuit Court claiming that defendant's negligent operation of the automobile in which plaintiff was a passenger had caused plaintiff serious impairment of body function. Defendant lost control and the car went off the road. Plaintiff was thrown from the car and knocked unconscious. She drifted in and out of consciousness on the way to the hospital. She had two cuts on the back of her head which were sewn up. She had bruises and a sore arm. She was sent home from the hospital the same night. Charles W. Simon, Jr., J., delivered an opinion from the bench finding liability but no serious impairment of body function. The trial court concluded that the complications in plaintiff's arm and lower back were of recent origin and that plaintiff's depression was not proximately caused by the injury. The trial court observed that plaintiff had suffered a limitation in physical activities but also observed that manipulations by a chiropractor may have worsened plaintiff's condition. The trial court found no serious impairment of body function because plaintiff was not disabled from employment, and because her pain could not be too great if she was willing to enter a demolition derby, could pitch softball, and could dance on tables when urged to do so by friends. Judgment for defendant. Plaintiff appeals. *Held:*

1. A finding of fact by a court in a nonjury trial is clearly erroneous where, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.

2. The trial court attached too much significance to plaintiff's willingness to enter a demolition derby, play softball, and dance on table tops. Evidence indicates that plaintiff has to "pay the fiddler" for her activity. Plaintiff was once very active,

REFERENCE FOR POINTS IN HEADNOTE
[1-5] 5 Am Jur 2d, Appeal and Error § 839.

but is no longer so. Plaintiff's unwillingness to completely curtail her former active lifestyle, and her willingness to "pay the price" to have some fun indicates courage rather than that the injury was not serious. Evidence establishes that plaintiff suffered a spine sprain, with pain radiating into arms and legs. Plaintiff has muscle spasms which, in a vicious cycle, are steadily increasing the pain. She has suffered loss of sensation of grip, and, intermittently, loss of use of the right arm. She has scoliosis. The pain associated with the injury is severe enough to cause her to take to bed intermittently, frequently seek out medical help, and to substantially reduce her physical and social activities. She suffers intermittent depression which makes her speak of suicide, caused by constriction of blood flow to the brain.

3. Plaintiff suffered serious impairment of body function as a result of the automobile accident; therefore, a mistake was committed by the trial court.

Reversed and remanded.

J. H. GILLIS, J., dissented. He would hold that trial evidence establishes or, at the very least, presents a question of fact as to whether or not plaintiff's alleged injuries were minor. The trial court's finding of no serious impairment of body function is supported by trial testimony and is not clearly erroneous.

OPINION OF THE COURT

1. APPEAL AND ERROR — FINDINGS OF FACT — BENCH TRIAL —
   CLEARLY ERRONEOUS — WITNESS CREDIBILITY — COURT RULES.
   Findings of fact by a trial court may not be set aside unless clearly erroneous; in applying this principle regard is given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it (GCR 1963, 517.1).

2. APPEAL AND ERROR — FINDINGS OF FACT — BENCH TRIAL —
   EVIDENCE — CLEARLY ERRONEOUS — MISTAKE.
   A finding of fact by a court sitting in a bench trial is clearly erroneous where, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.

3. APPEAL AND ERROR — JURY AND NONJURY VERDICTS.
   The judicial sieve employed by the Court of Appeals in reviewing a nonjury case is appropriately of finer mesh than the one correspondingly employed in the review of a jury's verdict.

4. Automobiles — Appeal and Error — Findings of Fact — Bench
   Trial — Review — Mistake — Serious Impairment of Body
   Function.

   A finding of fact by a court in a nonjury case that a plaintiff
   suffered no serious impairment of body function as a result of
   an automobile accident is reversible on appeal where the
   appellate judges, upon review of the entire record, are left with
   a definite and firm conviction that serious impairment of body
   function did occur and that the trial court had made a mistake.

                    Dissent by J. H. Gillis, J.

5. Automobiles — Appeal and Error — Findings of Fact — Bench
   Trial — Review — Clearly Erroneous — Evidence — Seri-
   ous Impairment of Body Function.

   *The findings of fact by a trial court in a nonjury case involving a
   plaintiff claiming serious impairment of body function as a
   result of an automobile accident should be sustained where the
   trial court found no serious impairment and the record estab-
   lishes or, at the very lease presents, a question of fact as to
   whether or not plaintiff's alleged injuries were minor; in a
   nonjury case, a trial court's decision is not clearly erroneous
   where there is ample testimony to support it.*

*Starr & Cornell,* for plaintiff.

*O'Connor, McNamara & O'Keefe,* for defendant.

Before: R. B. Burns, P.J., and J. H. Gillis and
V. J. Brennan, JJ.

R. B. Burns, P.J. Plaintiff brought suit under
the no-fault automobile insurance act alleging that
defendant's negligent operation of an automobile
in which plaintiff was a passenger had caused
plaintiff serious impairment of body function. See
MCL 500.3135(1); MSA 24.13135(1). A bench trial
was held, at the conclusion of which the trial court
found negligence, but no serious impairment of
body function. Plaintiff appeals and we reverse.

Plaintiff's primary contention on appeal is that

the trial court erred in finding no serious impairment of body function.

Findings of fact by the trial court may not be set aside unless clearly erroneous. In applying this principle regard is given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it. GCR 1963, 517.1. A finding of fact is clearly erroneous where, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244, 245 (1976). "The 'judicial sieve' employed here is appropriately 'of finer mesh than the one correspondingly employed here on review' of a jury's verdict. *Schneider v Pomerville,* 348 Mich 49, 54-55; 81 NW2d 405 (1957)." *Hi-Way Motor Co v International Harvester Co,* 398 Mich 330, 339; 247 NW2d 813, 817 (1976).

Testimony at trial by plaintiff, her family, and friends, established that, prior to the accident, plaintiff was a healthy, active and sociable person. She was never sick and never complained of neck or back problems. She was very active, engaging in intramural high school volleyball, bike riding, roller skating, motorcycling, and snowmobiling. She would help out around her father's farm, loading corn in the pickup, mowing the lawn, and picking up stones in the field. She would do acrobatics on the flagpole and a barn rope. She was variously described as happy-go-lucky, a girl who wanted to live for everything, always on the run, fun-loving, and a "terror". She went out at least four nights a week. A month before the accident she moved out of her parents' home to live in an apartment with a girlfriend.

The accident occurred November 16, 1973, shortly after midnight. Plaintiff was 19 years old. Defendant lost control of the car and it went off the road. Plaintiff was thrown from the car and knocked unconscious. She drifted in and out of consciousness on the way to a hospital by ambulance. She had two cuts on the back of her head which were sewn up. She also had bruises on her body and one arm hurt, although, by the time of trial, she could not say which arm. X-rays were taken, and apparently were negative. She was sent home from the hospital the same night.

Plaintiff's roommate testified that, when plaintiff came home from the hospital, plaintiff was very tense, had severe headaches, and complained of back and head pain. Plaintiff started keeping to herself, and hardly ever went out after the accident. She had rarely seen plaintiff since plaintiff moved out in February of 1974.

Plaintiff testified that the head cuts hurt so much that she did not really notice any neck or back pain until the stitches were removed by Dr. Laughlin on November 23, 1973. She thereafter went to her family physician, Dr. Anderson, on December 23, 1973, complaining of pain in her neck, shoulders and back. Dr. Anderson testified by deposition that his diagnosis was whiplash—multiple soft tissue injuries of the back, shoulders and neck. Considering the absence of complaints of this type before the accident, Dr. Anderson concluded that the injury was the result of the accident. He provided plaintiff with ultrasonic treatment, muscle relaxants, anti-inflammatory agents and pain tablets. Plaintiff returned to Dr. Anderson for further treatments on December 5, December 11, and December 28, 1973. However, despite treatments by Dr. Anderson and other doctors, plaintiff's pain has persisted and gotten worse.

Plaintiff moved back to her parents' farm in February, 1974. Plaintiff's family testified that, since the accident, plaintiff always seems to be either complaining about her neck and back pain or is in bed suffering. She sometimes takes to bed for three days at a time. Someone is always having to rub her back or neck for her. She gets very depressed, has crying jags, says she doesn't want to live, and threatens to kill herself. Her father can't talk to her because she runs off and cries. Her sister testified that the depression is getting worse.

Plaintiff's level of physical activity has been reduced. Plaintiff can no longer bowl, or ride horses, snowmobiles or motorcycles, or do acrobatics. She cannot help out on farm chores. She did enter a demolition derby in August, 1974, but her car quit before the start and she was not hit. She wore a helmet, neck collar, padding and seatbelt for protection. She played slow pitch softball because she wanted to have some fun, but she hurt afterwards. Rather than go to a party with her teammates after the games, she would go home, clean up, and go to bed. Her brother observed that she could play the game, but she "paid for it" in pain.

Plaintiff's social life has suffered. She only goes out once or twice a week now, because she recognizes that she has become a chronic complainer and does not want to spoil the fun of friends. However, she can and does get on the top of tables and dances when urged to do so by friends. Plaintiff's sister testified that, when they go out, plaintiff can't keep up and wants to go home too soon. Plaintiff cancelled three shopping trips she had agreed to go on with her sister prior to the last Christmas, saying she was too sick with a sore

neck to go. When she went to Florida with a girlfriend, driving only a little because it bothered her, she found she could not get out of the hotel bed by herself, or even lift her head off the pillow, because of her sore neck and back. She had no fun at the last Tip-up Town, because she had a sore back and neck, could not ride snowmobiles like everyone else, and the friend she was with ignored her.

Plaintiff testified that her condition is getting worse. Her back pain is more constant, and becoming worse in her lower back. Her left arm had developed shooting pains if she lifted it too far, but in September, 1977, it got worse and she couldn't use it for three weeks. Just before trial she found she was losing her grip, dropping things, and could not type accurately. However, she believes she could still do secretarial or selling work, though she was not working. Sometimes when she sits, her legs get numb or go to sleep. She wears a neck collar at home, and is currently taking valium and muscle relaxants.

Plaintiff has sought medical help frequently. Between January 14, 1974, and October 26, 1974, she went to Dr. Tarry, a chiropractor, for manipulations 56 times. This would provide her with temporary relief. She then went to Dr. Badgley three times between November, 1975, and January, 1976. Dr. Badgley prescribed pain relievers and muscle relaxants, and advised that she discontinue chiropractic treatment while she was in his care. However, the medications hurt plaintiff's stomach and made her drowsy, so she only took them when the pain became severe. She went back to Dr. Anderson in March and April, 1976, for traction treatment, muscle relaxants, aspirin and an anti-inflammatory agent. She went to a Dr.

O'Connor twice during the summer of 1976 for manipulations of her back and hip. During October and November she returned to Dr. Anderson for ultrasonic treatments. Starting in the summer of 1977 to the time of trial, February, 1978, she saw a Dr. Brown for manipulations and valium. She saw Dr. Badgley a last time in October, 1977.

Dr. Badgley testified by deposition that when plaintiff visited him in November, 1975, she complained of cervical, dorsal and lumbar spine pain radiating into the shoulders and sometimes arms, aggravated by lifting of arms over the head; intermittent sharp shooting leg pain; and headaches. He diagnosed residual cervical, dorsal, lumbar spine sprain. He defined sprain as a tearing of supporting tissues around joints caused by movement of the joint beyond normal range. Plaintiff was suffering from trapezius muscle spasm, which he described as a vicious cycle whereby the muscle contracts to limit motion in response to pain, which, self-defeating, causes more pain and more spasm and pain. Her range of motion in the neck and back were normal, but there was pain at the extreme of range of motion. She had a gentle scoliosis in the dorsal-lumbar area, caused by muscles pulling harder on one side than the other, bowing the spine. Dr. Badgley testified that, when plaintiff returned in October, 1977, she complained that she hurt most of the time in the cervical area, and had intermittent pain in the lumbosacral region. He once again found muscle spasm over the trapezius. He found plaintiff had developed a loss of sensation in the right shoulder and arm, extending to the ring and long fingers, showing compression of the nerve roots in the neck. The scoliosis had become worse. He testified that it would not be possible to fake loss of sensation,

muscle spasm, or scoliosis. Characteristic of an
injury of this type is an inability to look up or
raise one's arms over the head without pain. Thus,
a person with this type of injury can't bowl, wash
windows, paint walls, horseback ride, jog, go snow-
mobiling, or play tennis. If they try to do such
things, they must "pay the fiddler" with pain.
Persons with this injury become depressed, weepy,
cranky, unpredictable, and have temper tantrums.
These personality changes are caused by muscle
spasm compressing the vertebral artery as it goes
into the skull, constricting blood flow. Those who
are married have an alarming divorce rate. Dr.
Badgley opined that, as plaintiff had been getting
worse, she would continue to get worse. Assuming
there were no similar symptoms before the acci-
dent, he opined that the accident caused the cur-
rent symptoms. Finally, he was certain that she
was not faking the injury.

The trial court delivered an opinion from the
bench, apparently finding liability[1] but no serious
impairment of body function. The trial court ap-
pears to have discounted the significance of the
complications in plaintiff's arm and lower back,
observing that they were of recent nature. The
trial court found that the depression was not
proximately caused by the injury. The trial court
observed that plaintiff had suffered a limitation in
physical activities, but also observed that the ma-
nipulations by the chiropractor may have wors-
ened plaintiff's condition. The trial court found no
serious impairment of body function because plain-

[1] Evidence on the liability issue was very slim. The trial court found
that "there's no question of the—liability is not an issue here". The
court then proceeded to discuss the serious impairment of body
function issue. If the trial court found no liability, the subsequent
analysis would have been superfluous. We conclude the trial court
found liability. As defendant did not cross-appeal, we do not reach the
issue of whether liability was established.

tiff was not disabled from employment, and because her pain could not be too great if she was willing to enter a demolition derby, could pitch softball, and could dance on tables.

Assuming the trial court found later complications insignificant, we disagree with the conclusion. Medical testimony was unequivocal that the inability to raise the arm above shoulder level without great pain is a natural condition of this type of injury, and that the recent loss of sensation is the result of compressed nerve roots arising out of the injury, and extends into the hand. Additionally, there is a clear inference that the lower back pain is caused by the injury. Merely because the more recent complications are removed from the injury by time does not mean they were not caused by the injury, where they are a result of a natural progression of the ailment. Certainly, loss of use and sensation in an arm is a serious complication worthy of consideration.

We do not agree that the depression was not proximately caused by the accident. Prior to the accident plaintiff was happy-go-lucky. After the accident she has suffered pain and intermittent depression. Dr. Badgley testified that depression is associated with this type of injury, and caused by constriction of the vertebral artery blood flow due to spasm. Plaintiff suffers from spasm, caused by pain from the sprain, which in turn was caused by the accident. We can see no basis for any inference but that the depression was proximately caused by the accident.

That the manipulations by the chiropractor may have been viewed by plaintiff's medical doctors as counterproductive is of no significance. Plaintiff obtained temporary relief from the manipulations. There is no evidence of negligence on her part in

selecting chiropractic care for her injury. *Reed v
Detroit,* 108 Mich 224; 65 NW 967 (1896). When
she was advised by Dr. Badgley to discontinue
chiropractic treatment because of incompatibility
with his treatment, she did so, at least until no
longer able to stand the pain which had not been
abated by Dr. Badgley's treatment.

We accept the trial court's conclusion that plain-
tiff was not disabled from employment, though
with reservation. Plaintiff testified that she was
able to do secretarial or sales work. However, she
had worked only three or four months in the last
three years; her father testified that she returned
to live with him because she could not hold a job,
and she would not be able to do heavy work; Dr.
Badgley agreed plaintiff could not do heavy work;
and, if plaintiff's arm is useless at times, it would
seem she would be hard put to type at those times.

We believe the trial court attached too much
significance to plaintiff's willingness to enter a
demolition derby, play softball, and dance on table
tops. Evidence indicates plaintiff has to "pay the
fiddler" for her activity. It is clear that plaintiff
was once very active, but is no longer so. That she
is not willing to completely curtail her former
active lifestyle, and is willing to "pay the price" to
have some fun, indicates courage, rather than that
the injury was not serious.

A review of the entire evidence establishes that
plaintiff suffered a spine sprain, with pain radiat-
ing into arms and legs. She has muscle spasms
which, in a vicious cycle, are steadily increasing
the pain. She has suffered loss of sensation, reduc-
tion of grip, and, intermittently, loss of use of the
right arm. She has scoliosis. The pain associated
with the injury is severe enough to cause her to
take to bed intermittently, frequently seek out
medical help, and to substantially reduce her phys-

ical and social activities. She suffers intermittent
depression which makes her speak of suicide,
caused by constriction of blood flow to the brain.
We conclude that she suffered serious impairment
of body function, and are left with a definite and
firm conviction that a mistake has been commit-
ted.

Reversed and remanded for a new trial on the
damage issue. Costs to plaintiff.

V. J. BRENNAN, J., concurred.

J. H. GILLIS, J. *(dissenting).* I dissent. The record
in this case establishes or, at the very least, pre-
sents a question of fact as to whether or not the
alleged injuries were minor. Plaintiff was treated
as an outpatient at the hospital. The record estab-
lishes or, at least, presents a question of fact of
whether the problems with plaintiff's arm or lower
back or hip were of recent origin. There is testi-
mony that plaintiff stated that her right arm did
not begin bothering her until the summer of 1977,
more than 3-1/2 years after the accident. She
stated that her hip problems did not arise until
Christmas of 1977.

There is a serious question as to the health
condition of the plaintiff prior to the accident in
question. Additionally, we have the testimony that
plaintiff attempted to drive a car in a demolition
derby but the car engine died out as she drove it
on to the field. Plaintiff is still able to dance on
table tops and frequently pitches softball in a
league. While plaintiff was at the hospital she
could not remember which arm hurt.

All of the above present a strong question of fact
for the fact finder. There is ample testimony to
support the trial court's findings. I find the court's
decision was not "clearly erroneous" and I would
affirm the trial court.