# STATE OF MICHIGAN

# COURT OF APPEALS

DARZEIL HALL and LAMARR JOHNSON,

        Plaintiffs-Appellees,

v

NATIONAL FORENSIC SCIENCE
TECHNOLOGY CENTER, INC., WILLIAM E.
CONRAD, and KRISTE KIBBEY-ETUE,

        Defendants,

and

MICHIGAN STATE POLICE, STATE OF
MICHIGAN, ROBERT TOPP, and JOHN
COLLINS,

        Defendants-Appellants.

UNPUBLISHED
August 9, 2016

No. 326048; 328482
Wayne Circuit Court
LC No. 12-000078-CZ

Before: SHAPIRO, P.J., and HOEKSTRA and RONAYNE KRAUSE, JJ.

PER CURIAM.

        In this race discrimination case brought pursuant to the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq*., defendants appeal by right a judgment entered by the trial court after a jury returned a verdict in favor of plaintiffs. In Docket No. 326048, defendants challenge the trial court's decision to deny their motions for summary disposition, directed verdict, and judgment notwithstanding the verdict (JNOV). Defendants argue that at all stages of the proceedings, plaintiffs presented insufficient evidence of discrimination to sustain their claim. Defendants also argue that the trial court erred in denying their motion for new trial or remittitur. In Docket No. 328482, defendants challenge the trial court's decision to award plaintiffs case evaluation sanctions under MCR 2.403(O). For the reasons stated in this opinion, we affirm.

-1-

## I. BACKGROUND

Plaintiffs are African-American males employed by defendant Michigan State Police (MSP). In 2010, the MSP was expanding its forensic science division and had several new forensic firearm examiner positions to fill.[1] Plaintiffs and four other MSP troopers were accepted for forensic firearms examiner training, which was initially conducted by defendant National Forensic Science Technology Incorporated (NFSTC) pursuant to a contract between the NFSTC and the MSP. Despite completing the training, plaintiffs did not receive a promotion to specialist sergeant within the forensic science division and were returned to their previous positions. Plaintiffs allege that their race was a motivating factor in that decision and filed suit against defendants. The trial court denied defendants' motion for summary disposition, concluding that there was a factual question for the jury. The trial court also denied defendants' motion for directed verdict for the same reason, and the jury returned a verdict in favor of plaintiffs. Defendants moved for JNOV, which the trial court denied. The trial court also denied defendants motion for remittitur. This appeal follows.

## II. ELCRA CLAIM

Defendants first challenge the trial court's denial of their motions for summary disposition, directed verdict, and JNOV.[2]

ELCRA prohibits an employer from failing or refusing to hire or recruit, discharging, or otherwise discriminating against an individual on the basis of race. MCL 37.2202(1)(a). A plaintiff may prove by direct or circumstantial evidence that racial discrimination was a motivating factor in his or her employer's decision. *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001). Here, as plaintiffs' evidence was indirect or circumstantial, they "must proceed by using the burden-shifting approach set forth in *McDonnell Douglas Corp v Green*,

---

[1] There were 11 forensic firearms positions available within the MSP forensic science division. The openings arose following the closure of the Detroit Crime Laboratory in 2008, which resulted in an effective doubling of the MSP's workload.

[2] We review de novo a trial court's decision on a motion for summary disposition, *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008), considering the "affidavits, pleadings, depositions, admissions, and other documentary evidence submitted by the parties in the light most favorable to the party opposing the motion." *Greene v A P Prods, Ltd*, 475 Mich 502, 507; 717 NW2d 855 (2006) (internal quotations and citations omitted). Summary disposition should only be granted "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *MEEMIC Ins Co v DTE Energy Co*, 292 Mich App 278, 280; 807 NW2d 407 (2011). We also review "de novo a trial court's denial of a motion for directed verdict or a motion for judgment notwithstanding the verdict." *Abke v Vandenberg*, 239 Mich App 359, 361; 608 NW2d 73 (2000). "[W]e view the evidence, as well as any legitimate inferences, in the light most favorable to the nonmoving party and decide whether a factual question exists about which reasonable minds might have differed." *Id*.

411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)." *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 133-134; 666 NW2d 186 (2003).

Under the *McDonnell Douglas* framework, a plaintiff bears the burden of establishing a prima facie case of discrimination. *Hazle*, 464 Mich at 463. If he or she is successful, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision. *Id.* at 464. If the employer meets that burden, then the plaintiff must present evidence that "demonstrate[s] that the evidence in the case, when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Id.* at 465 (quotation marks and citations omitted). The goal of the *McDonnell Douglas* approach is to determine whether "there is a jury-submissible issue on the ultimate fact question of unlawful discrimination." *Id.* at 466.

In order to establish a *McDonnell Douglas* prima facie case, the plaintiff must present evidence showing: (1) the plaintiff was a member of a protected class, (2) the plaintiff suffered an adverse employment action, (3) the plaintiff was qualified for the position, and (4) the opportunity was given to another person "under circumstances giving rise to an inference of unlawful discrimination." *Id.* at 463 (citations omitted). As to the prima facie case, the first two elements, i.e. that plaintiffs were members of a protected class and that they suffered an adverse employment action, were undisputed. Defendants, however, argue that plaintiffs presented insufficient evidence to support the third and fourth elements of a *McDonnell Douglas* prima facie case.

We conclude that plaintiffs presented sufficient evidence to establish the third element of the *McDonnell Douglas* prima facie case, i.e., that they were qualified. Plaintiffs presented testimony and documentary evidence showing (1) they completed the NFSTC training modules, (2) they completed the moot court assignment at the end of the firearms training schedule, and (3) they were awarded a certificate stating that they had "successfully completed the Michigan State Police forensic firearms training." Further, defendant John Collins, the director of the forensic firearms division and the individual who ultimately made the decision to remove plaintiffs from the program, acknowledged at his deposition that the certificate "very strongly" suggested that plaintiffs had successfully completed the firearms examiner training.[3] Accordingly, we conclude that there was sufficient evidence for a reasonable jury to conclude that plaintiffs were qualified.

Defendants also argued that plaintiffs failed to present evidence on which a jury could infer unlawful discrimination, i.e., the fourth element of a *McDonnell Douglas* prima facie case.

---

[3] Defendants direct us to deposition testimony from witnesses who opined that plaintiffs were not qualified for the promotion. However, although such evidence was relevant to the question of whether defendants had a legitimate reason for their decision to remove plaintiffs from the program and whether the articulated reason was pretextual, the mere existence of difference of opinion as to whether plaintiffs were qualified does not negate plaintiffs' evidence showing that they were qualified.

However, plaintiffs did present evidence that they were rejected in favor of a less qualified white trainee. The summary disposition evidence established that plaintiff Johnson scored higher than two of the white trainees on the final cumulative score for the NFSTC online assessments that plaintiff Hall scored higher than one of the white trainees on the final cumulative score for the NFSTC online assessments. Although there was evidence that plaintiffs, a white trainee, and another African-American trainee received remedial training because the NFSTC had concerns about their competency, the evidence at summary disposition was that plaintiffs completed the remedial training and completed the NFSTC training, which culminated in a moot court assignment. Further, all six original trainees attended the same graduation ceremony and were all awarded the same certificate of successful completion of the NFSTC training. Accordingly, we conclude that plaintiffs presented sufficient evidence to establish the fourth and final element of a *McDonnell Douglas* prima facie case.

The burden then shifted to defendants to articulate a legitimate, nondiscriminatory reason for their decision to remove plaintiffs from training while allowing all of the white trainees to proceed. At summary disposition, defendants presented deposition testimony that plaintiffs were removed because they failed to satisfactorily complete the moot court assignment. Defendants also presented a memorandum from a NFSTC instructor in which the instructor opined that plaintiffs could not be trained to competency, and a memorandum purportedly[4] from MSP Captain Gregoire Michaud to defendant MSP First Lieutenant Robert Topp recommending that plaintiffs be removed because of deficiencies in their moot court performance. Plaintiffs do not dispute that this was sufficient to rebut their prima facie case, thereby returning the burden to them to show that the articulated reason was a pretext for discrimination.

Defendants argue that plaintiffs were unable to present sufficient evidence to show that the articulated reason was pretext for discrimination. However, as noted above, plaintiffs completed the NFSTC online assessments, each scoring higher than at least one white trainee on the cumulative score. Next, plaintiffs completed the remedial training and were allowed to participate in the moot court assignment, which they completed. Although defendants presented evidence that plaintiffs had trouble with their moot courts, plaintiffs presented evidence that a white trainee also had trouble with his moot court and was allowed to continue. Further, Collins testified at his deposition that the moot court performances had minimal importance because moot court was a skill that could be coached. He testified that the more important skill was whether a trainee was capable on the microscope, i.e., whether he or she could do the underlying science aspects of the job. At that point, defendants did not allege that plaintiffs' microscope skills were deficient.[5] Next, two days after completing the moot court assignment, plaintiffs

---

[4] It was revealed that Michaud and Topp co-wrote the memorandum. Michaud explained that he was not at the moot court, whereas Topp was one of the individuals evaluating the moot court performances for all the trainees. He therefore testified that the parts of the memo pertaining to the moot court were written by Topp.

[5] At trial, there was testimony that plaintiffs' microscope skills were deficient, but there was also testimony that the remedial training evaluators reported that plaintiffs did not have problems with their microscope skills.

were presented with a certificate stating that they had successfully completed the firearms training. It was undisputed that the moot court assignment was part of the firearms training. It was also undisputed that all of the trainees were awarded the same certificate. Notably, the certificate had the MSP symbol on it and was handed out by Michaud, a member of the MSP.[6] Weeks after plaintiffs received the certificate, a NFSTC instructor wrote a memo stating that plaintiffs were unlikely to become competent firearms examiners because of deficiencies revealed by the moot court assignment. After receiving that memo, Michaud and Topp co-wrote a memo to Topp recommending that plaintiffs be removed from the program because of deficiencies in their moot court performances. Given that both the NFSTC memo and the memo from Michaud and Topp to Topp were sent *after* plaintiffs had completed the NFSTC training, which included the moot court, and were then awarded a certificate stating that they had successfully completed the firearms training, a reasonable jury could conclude that the reasons for the removal were a pretext for discrimination. The timing of the memorandums strongly suggested that the reason for the removal recommendation was nothing more than an after-the-fact reason fabricated to justify the decision to remove plaintiffs even though they had scored better than some of their white counterparts and had received the same certificate of successful completion. Accordingly, on this record, the trial court did not err in denying the motion for summary disposition.

In addition to the foregoing evidence, plaintiffs presented more circumstantial evidence of discrimination at trial. First, there was evidence that during the remedial training period, all four trainees were required to maintain a satisfactory rating during monthly evaluations performed by senior forensic firearms examiners. The evaluation forms for plaintiffs and one of the white trainees were admitted into evidence at trial. The forms showed that during the first evaluation period plaintiff Johnson and the white trainee both received two "poor" marks, but plaintiff Hall did not receive any poor marks. During the second evaluation period, plaintiffs and the white trainee all received two poor marks. During the third evaluation period, plaintiff Johnson and the white trainee again received two poor marks, whereas plaintiff Hall did not receive any. Thus, the evidence allowed for an inference that plaintiff Hall performed better during the remedial training than the white trainee and that plaintiff Johnson performed the same as the white trainee.[7]

Second, unlike the summary disposition motion, defendants presented expanded testimony at trial on their reasons for removing plaintiffs from the training program. Topp,

---

[6] The certificate was signed by a member of the NFSTC and had the NFSTC symbol on it as well. However, when viewing the evidence, we are to view it in the light most favorable to the non-moving party, i.e., plaintiffs. Thus, although a jury could conclude that the presentation of the certificate only represented the NFSTC's view that the training was complete, the fact that it was handed out by MSP personnel and had the MSP logo on it allowed for an inference that the MSP had also concluded that plaintiffs had successfully completed the training.

[7] Four individuals participated in the remedial training: plaintiffs, a white trainee, and a third African-American trainee. The other African-American trainee did not receive any poor marks on any of his remedial evaluations.

Michaud, and Collins testified that plaintiffs were removed based on their performances during the NFSTC training, the remedial training, and the moot courts. Michaud, however, was impeached with his deposition testimony that plaintiffs' removal was justified "based strictly on this moot court." Collins was also impeached with his deposition testimony that the moot court had minimal importance because it was a skill that could be coached, whereas at trial he testified that the moot court was "very, very important." Collins was also impeached by an affidavit in which he averred that plaintiffs were removed for their failure to successfully complete the moot court assignment and because of the NFSTC's recommendation. The NFSTC's recommendation, as noted above, came weeks after plaintiffs were awarded a certificate of successful completion of the MSP firearms training. The jury also had the memo from Michaud and Topp to Topp—written after plaintiffs' graduation ceremony—that recommended plaintiffs' removal because of deficiencies in their moot court performances. In other words, the jury had evidence showing that, despite originally stating that the reason for the removal was plaintiffs' allegedly deficient moot court performances, defendants were now adding additional reasons. The jury could infer that the later reasons, which were contrary to the written evidence on the issue, were fabricated at trial to justify the decision to remove plaintiffs. Moreover, the jury could also infer that the written documents were just a pretext for discrimination, considering that they were sent *after* plaintiffs were awarded certificates of successful completion of a training program that included the moot court performances.

Finally, unlike the summary disposition motion, a video of plaintiffs and two of the white trainees' moot court performances was available. The record reflects that the moot court performances took place in the Oakland Circuit Court and were supposed to be recorded. During discovery, plaintiffs had requested a copy of the recordings, but defendants stated that they did not have a copy and did not believe a copy existed. After the summary disposition motion but before trial, plaintiffs' counsel went to the Oakland Circuit Court and inquired whether a copy of the recordings was still available. The circuit court indicated that the original recording still existed and provided the parties with copies. Therefore, at trial, the videos of the performances and, more importantly, the critiques following the performances, were admitted into evidence without objection. Although copies of the recordings were not provided on appeal, Michaud viewed the critiques following plaintiffs and the two white trainees' performances. He testified that each trainee received lots of criticism and none of them were perfect. Further, and more critically, by viewing the videos, the jury was able to evaluate whether the originally articulated reason for removing plaintiffs from training—i.e. deficient moot court performances—was just a pretext for discrimination.

Viewing the foregoing evidence in the light most favorable to plaintiffs, there was sufficient circumstantial evidence of race discrimination presented at trial to support the trial court's decision to deny defendants' motion for directed verdict, to support the jury's decision to find in favor of plaintiffs, and to support the trial court's decision to deny defendants' motion for

JNOV.[8]  Accordingly, we find no error in the trial court's denial of defendants' motions for directed verdict and JNOV.

## III.  CASE EVALUATION SANCTIONS

Defendants next argue that the trial court erred in awarding plaintiffs case evaluation sanctions under MCR 2.403(O).[9]  Defendants' argument, however, is premised on the belief that the trial court erred in denying their motions for summary disposition, directed verdict, and JNOV.  In other words, defendants argue that because the case should have never been submitted to the jury and the verdict against them should not have been allowed to stand, there is no basis on which to award case evaluation sanctions.  Because we conclude that the case was properly submitted to the jury and that the verdict returned by the jury was supported by sufficient evidence, we conclude that this issue is without merit.

## IV.  REMITTITUR

Finally, defendants argue that the trial court abused its discretion in denying their motion for remittitur or new trial.[10]  Defendants contend that the award of economic damages was not

---

[8] Defendants argue that plaintiffs cannot show racial animus because one of the trainees allowed to advance was an African-American.  However, although defendants' decision to allow one African-American trainee to advance allows for an inference that race was not a motivating factor in defendants' decision with regard to plaintiffs, the jury was not required to draw that inference.  Because we must view the evidence in the light most favorable to the non-moving party, we do not find this fact dispositive.  See *Campbell v Dep't of Human Servs*, 286 Mich App 230, 240; 780 NW2d 586 (2009).

[9] A trial court's decision to grant case evaluation sanctions under MCR 2.403(O) is subject to de novo review.  *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008).

[10] We review for an abuse of discretion a trial court's decision whether to grant a motion for remittitur.  *Diamond v Witherspoon*, 265 Mich App 673, 692; 696 NW2d 770 (2005).  A new trial may be granted when a jury verdict awarding damages is either clearly or grossly excessive or against the great weight of the evidence.  MCR 2.611(A)(1)(d), (e).  Alternatively, where it is claimed an award is excessive, the trial court may offer the prevailing party an opportunity to consent to judgment in the highest amount that is supported by the evidence.  MCR 2.611(E)(1).  A new trial on the basis that a verdict is against the great weight of the evidence may be granted only when the evidence "preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand."  *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008).  In sum, a jury award of damages should not be disturbed when it "falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation. . . ."  *Shaw v City of Ecorse*, 283 Mich App 1, 17; 770 NW2d 31 (2009).  The trial court only abuses its discretion when its ruling is outside the range of principled outcomes.  *Heaton v Benton Constr Co*, 286 Mich App 528, 538; 780 NW2d 618 (2009).

supported by the evidence because plaintiffs' expert testified that plaintiff Hall's economic damages were $586,000 and plaintiff Johnson's economic damages were $667,000, whereas the jury awarded Hall $856,000 and Johnson $1,018,000. Defendants' argument fails to take into account that the jury was not bound to accept the valuation posited by plaintiffs' expert. Instead, the jurors were free to evaluate the evidence presented and reach their own conclusions as to the amount of economic damages sustained by plaintiffs.

Plaintiffs' expert testified that the pay differential between a trooper and a specialist sergeant was $10,000 per year and that, at ten hours of overtime per week,[11] a sergeant would earn overtime salary of $27,000 per year. In addition, plaintiffs' expert testified that the difference between a trooper's pension and a specialist sergeant's pension was about $6,000 per year. The expert also testified that Hall would be entitled to pension benefits through 2057 and Johnson would be entitled to pension benefits through 2055. Although the expert assumed that plaintiffs would retire as soon as they were entitled to full retirement benefits, both plaintiffs testified that they were going to continue working as long as they were physically able to do so.

Accordingly, the jury could reasonably infer that Hall was going to work until he was 60 years old, which would mean that he would have served as a specialist sergeant for 20 years before retirement, after which he would be entitled to collect pension benefits for 26 years. The jury could also reasonably infer that Johnson was going to work until he was 65 years old, which would mean that he would have served as a specialist sergeant for 26 years before retirement, after which he would be entitled to pension benefits for 18 years. As such, the jury could have calculated that Hall was entitled to $200,000 in base pay, $540,000 in overtime pay, and $156,000 in pension benefits, and that Johnson was entitled to $260,000 in base pay, $702,000 in overtime pay, and $108,000 in pension benefits. Taken as a whole, therefore, the evidence would support a jury determination of economic damages of $896,000 for Hall and $1,070,000 for Johnson. Thus, even without an award of interest, which the jury was instructed it could add at a rate of 12%, the jury's verdicts of $856,000 for Hall and $1,018,000 for Johnson were less than the amount supported by the testimony, and the trial court did not abuse its discretion when it denied the remittitur motion.

We also reject defendants' argument that the trial court abused its discretion when it denied their motion for remittitur or new trial with regard to the non-economic damages award.[12] An award of non-economic damages is "not subject to exact mathematical calculation." *Moore v*

---

[11] Plaintiffs both testified that specialist sergeants in the forensic firearms division of the MSP were receiving ten hours of overtime per week.

[12] "[A]n abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006) (quotation omitted). A trial court only abuses its discretion if its decision falls outside the range of reasonable and principled outcomes. *Id*. In determining if an award is excessive, we "must accord the trial court due deference . . . and only reverse if there was no justification for the ruling made." *Diamond*, 265 Mich App at 694 (quotation marks and citation omitted).

-8-

*Spangler*, 401 Mich 360, 378; 258 NW2d 34 (1977). "[T]he authority to measure damages for pain and suffering inheres in the jury's role as a trier of fact." *Kelly v Builders Square, Inc*, 465 Mich 29, 34; 632 NW2d 912 (2001). Further, victims of discrimination "may recover for the humiliation, embarrassment, disappointment and other forms of mental anguish resulting from the discrimination, and medical testimony substantiating the claim is not required." *Campbell v Dep't of Human Servs*, 286 Mich App 230, 246; 780 NW2d 586 (2009) (citation and quotation marks omitted). Plaintiffs both testified about their non-economic damages. Hall testified that, although he had been socialized to be strong, he was unable to "put into words the level of embarrassment, humiliation" that he suffered. He testified that he felt betrayed and thrown away and that he had lost sleep and was withdrawn from his family. Hall also felt as if he was never going to be promoted, a feeling that was reinforced when he received no response to a recent application for a vacant forensic firearms position. Moreover, Johnson testified that he felt marginalized, undervalued, and underestimated when white trainees who scored the same as or worse than him advanced with the training and he did not. He testified that the stigma of getting kicked out of the program would follow him, was a permanent check on his record, marked him as a failure, and ruined his career. He testified that it also ruined his credibility by labeling him an idiot and saying he made up information. Accordingly, there was sufficient evidence to support an award of non-economic damages in this case.

When determining whether the verdict was excessive a court can look at the jury's award of verdicts in similar cases. However,

> As noted by our Supreme Court [in *Precopio v Detroit*, 415 Mich 457, 471; 330 NW2d 802 (1982)], "no two cases precisely resemble one another" and "no two persons sustain the same injury or experience the same suffering." [] Recognizing those issues, it held that "[a]n appellate court should not attempt to reconcile widely varied past awards for analogous injuries which in the abbreviated appellate discussion of them seem somewhat similar." *Id*. (citation and quotation marks omitted). Moreover, a dollar amount can never truly be placed on an individual's pain and suffering. *Phillips v Deihm*, 213 Mich App 389, 405; 541 NW2d 566 (1995). [*Freed v Salas*, 286 Mich App 300, 336; 780 NW2d 844 (2009).]

Further, "appellate review of jury verdicts must be based on *objective* factors and firmly grounded in the record." *Id*. at 334 (quotation omitted; emphasis in original). "[F]actors that should be considered by this Court are: (1) whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; (2) whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; and (3) whether the amount actually awarded is comparable with awards in similar cases both within the state and in other jurisdictions." *Id*. In *Freed*, we upheld the denial of remittitur where the defendant "failed to adequately communicate how its 'analogous' cases take into account the factual differences in the injuries and the victims[.]" *Id*. at 337. Here, there is no evidence that the verdict was the result of "improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact." See *id*. at 334. Further, although defendants and plaintiff both offered the trial court summaries of verdicts and settlements in other cases involving discrimination, the comparable verdicts and settlements cited by the parties showed a wide range of non-economic damage awards, some

lower and some higher than the amounts awarded in the instant case. Given that "a dollar amount can never truly be placed on an individual's pain and suffering," *id.* at 336, we conclude that in this case the trial court properly considered the comparable verdicts and settlements submitted by both sides and made a reasonable and principled decision that was not inconsistent with the comparables presented. As a result, the trial court did not abuse its discretion in denying defendants' motion for remittitur or new trial.

## V. CONCLUSION

We conclude that the trial court did not err in denying defendants' motions for summary disposition, directed verdict, or JNOV because there was sufficient evidence presented at each stage of the proceedings to allow a jury to conclude that race was a motivating factor in defendants' decision. For the same reasons, the trial court did not err in awarding case evaluation sanctions. Finally, the trial court did not abuse its discretion in denying defendants' motion for remittitur or new trial.

Affirmed. Plaintiffs, as the prevailing parties, may tax costs. MCR 7.219(A).


/s/ Douglas B. Shapiro
/s/ Joel P. Hoekstra
/s/ Amy Ronayne Krause